UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

———————————————

TANFRAN, INC.,

       Plaintiff,

v.                                                                      Case No. 1:06-CV-830

ARON ALAN, LLC, et al.,                                 HON. GORDON J. QUIST

       Defendants.

———————————————/

## OPINION

### I. Background

Plaintiff, Tanfran, Inc. ("Tanfran"), is a Michigan corporation and a franchisor of Mirage Tanning Center franchises that operate under the MIRAGE™ mark. Bryan Punturo is Tanfran's sole officer. Defendant Aron Alan, LLC ("Aron Alan") is a Michigan limited liability company and Aron Schrotenboer was its sole member. Aron Alan purchased four franchises from Tanfran between February 2000 and January 15, 2002. In September 2004, after another Tanfran franchisee showed him a profit and loss statement for a Tanfran-owned tanning store, Aron Schrotenboer began to suspect that Tanfran and Punturo had misrepresented financial information to Aron Schrotenboer and Aron Alan in connection with the sale of the franchises to Aron Alan. Soon thereafter, Aron Alan stopped paying royalties to Tanfran. That same month, Aron Alan and Aron Schrotenboer filed a complaint against Tanfran and Bryan Punturo in the Northern District of Indiana alleging a claim under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.*, and various state law claims. On December 1, 2004, the Indiana court transferred the case to this

Court.  On February 8, 2006, this Court granted Tanfran's and Bryan Punturo's motion for summary judgment on Aron Alan's and Aron Schrotenboer's claims, leaving Tanfran's counterclaim for unpaid royalties as the only issue in the case for trial.  By Order dated May 3, 2006, Kim A. Schrotenboer, as Personal Representative of the Estate of Aron A. Schrotenboer (the "Estate"), was substituted for Aron Schrotenboer, who died in January 2006, prior to the Court's ruling on the summary judgment motion.  The parties subsequently stipulated to the entry of a judgment against Aron Alan and the Estate in the amount of $271,000.00 on Tanfran's counterclaim, while preserving Aron Alan's and the Estate's right to appeal the Court's ruling on the summary judgment motion.  Pursuant to that stipulation, Aron Alan and the Estate filed a notice of appeal on August 8, 2006, which is currently pending before the Sixth Circuit.

Tanfran filed the instant action on November 22, 2006, against Aron Alan and the Estate alleging a claim under the Lanham Act for unfair competition, a claim for breach of the franchise agreements, and a claim for breach of the covenants not to compete set forth in the franchise agreements.  According to the verified complaint, Aron Alan and the Estate failed to post a bond securing the judgment on appeal and continued to operate the tanning salon franchises using the MIRAGE™ mark without paying royalties and other fees.  Tanfran alleged that it provided notice to Aron Alan and the Estate on October 18, 2006, that if they did not cure the defaults under the franchise agreements within thirty days, Tanfran would terminate the franchise agreements.  Tanfran also alleged, and it is apparently undisputed, that Aron Alan and the Estate did not cure the breaches within that time, and Tanfran therefore terminated the franchise agreements.  Tanfran further alleged that, in spite of the terminations, Aron Alan and the Estate continued to operate the four tanning franchises under the MIRAGE™ marks.  Along with its complaint, Tanfran filed a motion for a

preliminary injunction, in which it requested that the Court enjoin Aron Alan and the Estate from operating tanning salon franchises under the MIRAGE™ mark and from owning or operating tanning salons within twenty-five miles of the four franchise locations, as required by the covenants not to compete set forth in the franchise agreements.

Tanfran filed a first amended verified complaint on December 4, 2006. The first amended complaint added the Susan Holmes Schrotenboer Trust (the "Trust") and Miracle Tanning, LLC ("Miracle") as defendants and added two additional claims, one for tortious interference with contract against the Trust and Miracle and the other for avoidance of a fraudulent conveyance under M.C.L. § 566.31, *et seq.*, apparently against Aron Alan and Miracle. In addition to its allegations set forth above, Tanfran alleged that: (1) Aron Alan surrendered its assets to the Trust on November 15, 2006; (2) Aron Alan failed to provide notice of the surrender to Tanfran or to offer Tanfran the right of first refusal as required by the franchise agreements; (3) the Trust assigned, transferred, or sold all of Aron Alan's assets, including its customer base, to Miracle; and (4) Miracle continues to operate the four franchise locations in breach of the franchise agreements.

The Court set a hearing on the motion for preliminary injunction for February 12, 2007. Prior to the hearing, the Trust and Miracle filed a response noting that Tanfran sought no injunctive relief against them and had not amended its motion to seek relief against them. The Trust and Miracle also set forth the details, including supporting documents, of the relationships between the Trust and Aron Alan and the Trust and Miracle. According to these Defendants, within a year after Aron Alan and Aron Schrotenboer signed the last franchise agreement, Aron Alan began to experience financial difficulty and needed funds to continue its operations. Susan Holmes Schrotenboer, Aron Schrotenboer's mother, agreed to loan Aron Alan $1 million through the Trust. On December 27,

3

2002, Aron Alan signed a promissory note in the amount of $1 million, a business loan agreement, and a security agreement, and Aron Schrotenboer signed an unconditional personal guarantee.  The loan was apparently funded on or about the same date, and some of the proceeds were used to pay creditors of Aron Alan.

In November 2006, after Tanfran sent its notice of termination to Aron Alan, Aron Alan was seriously in default under the loan agreement with the Trust.  The Trust  obtained an appraisal of the collateral, which showed a liquidation value of $68,530 and a fair market value of only $145,160, compared to the existing indebtedness of $950,000.  Based upon this information, the Trust entered into a surrender agreement with Aron Alan (to foreclose on its security interest) and gave notice to all parties entitled to notice.  The Trust also sent notice of the surrender to Tanfran.   Thereafter, the Trust set up a new business called Miracle Tanning, LLC, to operate a tanning business using the surrendered assets.  The Trust or Miracle entered into new lease agreements or took assignments of the old leases of the locations at which Aron Alan had conducted business.  The Trust and Aron Alan also stated in their response that they had changed the names on the four locations from Mirage to Miracle.  The Trust and Aron Alan asserted that Tanfran had no basis for its claims against them.  Regarding the tortious interference claim, they argued that the Trust's lawful exercise of its right as a secured creditor to obtain its collateral upon default is not tortious interference as a matter of law and that by the time the trust repossessed its collateral, Tanfran had already sent the notice of termination, thus showing that the Trust's acts did not cause the breakdown in the relationship between Tanfran and Aron Alan.  They also asserted that there was no contract in existence at the time the Trust repossessed its collateral.  Regarding the fraudulent conveyance claim, they argued that Tanfran could not prevail on that claim because the indebtedness given in exchange for the

4

collateral constituted "reasonable equivalent value" as a matter of law under the Uniform Fraudulent Transfer Act.

On February 8, 2007, Tanfran and Aron Alan filed a stipulation and a proposed order, which the Court subsequently entered, in which Aron Alan agreed to the requested injunctive relief.  That same day, Tanfran filed a supplemental brief confirming that it was in fact seeking injunctive relief against Miracle and the Trust and noting that it had not amended its motion because its motion sought to enjoin Aron Alan and those in active concert and participation with Aron Alan, which included both the Trust and Miracle.  In addition, Tanfran submitted three affidavits showing that: (1) the staff at the Miracle tanning locations was the same as the staff of the Mirage franchises; (2) persons calling the telephone numbers of the franchise locations were transferred to new telephone numbers obtained by Miracle; (3) the Trust and Miracle continued to offer tanning packages sold by the franchises; (4) the sales and promotions run by Miracle parallel those run by the Mirage network; and (5) the Trust's and Mirage's efforts to rebrand the locations as Miracle stores were incomplete because the external sign at the Alpine location continued to identify the location as a Mirage location as late as February 6, 2007.  Finally, Tanfran argued that the Trust and Miracle should be enjoined from violating the covenants not to compete.

Not to be outdone by Tanfran, the Trust and Miracle filed a reply requesting that the hearing be cancelled due to Tanfran's failure to identify them as subjects of the motion for preliminary injunction until February 8, 2007, when Tanfran filed its brief indicating its intent to proceed with the motion against the Trust and Miracle.  The day of the hearing, February 12, 2007, Tanfran filed a response pointing out its reasons why the Trust and Miracle had ample notice of Tanfran's intent to seek relief against the Trust and Miracle.

The Court held the hearing on Tanfran's motion on February 12, 2007, following which it entered an Order requiring Miracle to: (1) remove the "Mirage" signs from all locations, including the entrance to the Alpine mall; (2) return to Tanfran all customer lists and other items required to be returned under the franchise agreements; and (3) take appropriate steps to eliminate its use of the telephone numbers used by the former franchise locations.  The Court also granted the Trust and Miracle an opportunity to submit a response to the non-compete issue and allowed Tanfran an opportunity to reply to the response.  Pursuant to that order, both parties have filed their briefs, and the Trust and Miracle have filed a further response and request for oral argument.  Finally, the Trust and Miracle have filed a certificate of compliance and exhibits, showing that they have complied with the Court's February 13, 2007, Order.

## II. Preliminary Injunction Standard

In ruling on a motion for a preliminary injunction, a court considers four factors: "(1) whether the plaintiffs are likely to succeed on the merits; (2) whether the plaintiffs will suffer irreparable harm in the absence of an injunction; (3) whether granting the injunction will cause substantial harm to others; and (4) whether the issuance of the injunction is in the public interest."  *Mich. State AFL-CIO v. Miller*, 103 F.3d 1240, 1249 (6th Cir. 1997).  These are factors to be balanced, not prerequisites that must be met.  *See Washington v. Reno*, 35 F.3d 1093, 1099 (6th Cir. 1994).  A district court need not make specific findings on each of the four factors if fewer factors are dispositive of the issue.  *See In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985).  Even if a plaintiff fails to show a strong or substantial likelihood of success on the merits, a court may grant injunctive relief where the plaintiff "at least shows serious questions going to the merits and irreparable harm which decidedly outweighs any potential harm to the defendant if an injunction is

6

issued." *Friendship Materials, Inc. v. Mich. Brick, Inc.*, 679 F.2d 100, 105 (6th Cir. 1982).

### III.  <u>Discussion</u>

As noted above, Tanfran initially sought injunctive relief against Aron Alan and the Estate but later expanded that request to include the Trust and Miracle.  Although Tanfran did not expressly indicate its intent to seek injunctive relief against the Trust and Miracle until it filed its supplemental brief in support of its motion for preliminary injunction on February 8, 2007, Tanfran showed that it had notified the Trust's and Miracle's counsel in late January 2007, that Tanfran was also seeking injunctive relief against the Trust and Miracle and that it had served discovery requests upon those Defendants seeking information to present at the February 12, 2007, hearing.  The Court also notes that the allegations of Tanfran's first amended complaint reasonably put the Trust and Miracle on notice that Tanfran would be seeking to enforce the non-compete provisions of the franchise agreements against those Defendants because the surrender of assets by Aron Alan and the Estate effectively mooted Tanfran's claims for relief against those parties.  In any event, in light of the hearing and the opportunity that the Court granted the parties to submit supplemental briefs on the issue of whether injunctive relief may extend to the Trust and Miracle, the Court concludes that the Trust and Miracle have had an adequate opportunity to present their reasons why Tanfran is not entitled to injunctive relief against them.

Because Aron Alan and the Estate have stipulated to the requested injunctive relief, only Tanfran's request for relief against the Trust and Miracle is at issue in the instant motion.  In addition, because the Trust and Miracle have provided proof of their compliance with the Court's February 13, 2007, Order, Tanfran's request for relief regarding the Trust and Miracle's use of the MIRAGE™ mark is now moot.  Thus, the only issue is whether there is any basis for the Court to

7

enjoin the Trust and Miracle from operating the tanning businesses on the basis of the non-compete provisions of the franchise agreements.

**A.      Likelihood of Success on the Merits**

The franchise agreements executed by Aron Alan and Aron Schrotenboer each contained a non-compete provision, which states that the franchisee, its officers, directors, members, managers, spouses, key employees, and others, will:

> Neither be associated, directly or indirectly, as an employee, proprietor, partner, stockholder, officer, agent, member, manager or otherwise in the operation of any similar business during the term of this Agreement no matter where such similar business may be located; nor be associated, directly or indirectly, as an employee, proprietor, partner, stockholder, officer, agent, member, manager or otherwise of a similar business for a period of two (2) years from termination of this Agreement . . . .  You further agree you cannot open another retail tanning shop under any name while the post-term covenant is in effect within twenty-five (25) miles of your location upon termination of this Agreement and within twenty-five (25) miles of any other Mirage Tanning Center retail location (whether franchised or operated by us or on of our affiliated entities) in operation at the time of termination of this Agreement. . . . .

(Franchise Agreement Art. 17, ¶ 17.1.)  As set forth in paragraph 17.1, the franchisee's non-compete obligation continues for two years after the date the franchise is terminated.  In addition to the agreement not to compete, the franchise agreement imposes several affirmative obligations upon the franchisee at termination.  Among other things, the franchisee must: (1) cease using the Mirage Tanning Center names and/or marks and not use any similar mark or name indicating a prior association with or status as a Mirage Tanning Center; (2) cease using the Mirage franchise telephone number and take steps to assign such number to Tanfran or another franchisee designated by Tanfran or discontinue using such number; (3) return all operations manuals, software programs, and other confidential information to Tanfran and to turn over any customer lists that the franchisee

possesses; (4) execute any instrument that Tanfran requires to recognize its rights to the premises; and (5) accept Tanfran's offer to purchase the franchisee's business assets associated with the franchisee's business if Tanfran elects to make such an offer at either the fair market value or the depreciated cost, not including goodwill. (*Id.* Art. 16, §§ 16.2, 16.4, 16.5-16.17.)

The Trust and Miracle contend that there is no basis for enforcing the non-compete provisions against them because they were not parties to franchise agreements and did not otherwise agree to be bound by the non-compete provisions. They assert that the Trust, as a secured creditor with priority over Tanfran's judgment lien, was entitled to exercise its legal right to take possession of Aron Alan's assets in partial satisfaction of the indebtedness. They further argue that there is no evidence that they are acting in concert with Aron Alan to avoid its obligations under the franchise agreements, and they assert that their decision to operate a tanning businesses in the former franchised locations was an entirely legitimate business decision to maximize the value of the surrendered assets in an ongoing business rather than liquidating them for a much smaller amount.

Tanfran contends that the non-compete provision may be enforced against the Trust and Miracle because through their actions, they are aiding Aron Alan in avoiding its obligations under the franchise agreements. Tanfran points to the non-arms-length nature of the loan between Aron Alan and the Trust, as well as the course of dealing between them regarding the default under the loan and the timing of the surrender agreement between them. It further notes that the Trust did not merely set up new businesses but, rather, capitalized on the good will of the franchises under the Mirage name by using the former franchise telephone numbers to refer customers to the Miracle tanning stores, by using the Mirage franchisee customer lists, by continuing to honor packages purchased by customers while the tanning stores were operated as Mirage franchises, and by

9

continuing the Mirage businesses uninterrupted with the same employees and same locations and servicing the same customers who were serviced by the Mirage franchises. Tanfran seeks injunctive relief against the Trust and Miracle pursuant to Fed. R. Civ. P. 65(d), which provides that an order granting injunctive relief is binding upon, among others, "those persons in active concert or participation" with the party to be enjoined. Tanfran asserts that the Trust and Miracle are engaged in active concert with Aron Alan.

In support of its request for injunctive relief against the Trust and Miracle, Tanfran cites various cases in which courts enjoined persons not parties to a non-compete agreement from conspiring with the bound parties to violate, or from directly violating, the non-compete agreement. For example, in *McCart v. H & R Block, Inc.*, 470 N.E.2d 756 (Ind. Ct. App. 1984), the Court of Appeals of Indiana enjoined the defendants, Robert and June McCart, from participating in a tax preparation business in violation of the non-compete provision in June McCart's franchise agreement with H & R Block. June, the wife, was an H & R Block franchisee for the Rochester, Indiana area. Robert, the husband, was a district manager for H & R Block and had acted on behalf of H & R Block in signing the franchise agreement with June. Beginning in August 1979, Robert worked at the H & R Block franchise in Rochester, located at 900 Main Street. During that time he also engaged in a separate accounting business. After June gave notice of termination of the franchise agreement to H & R Block, June and Robert sought to open a competing tax service at the same 900 Main Street address of their former H & R Block franchise. They sent letters to former clients informing of them of June's disassociation with B & R Block and of the opening of the new tax service. After the new H & R Block franchisee opened a new location, persons who inquired about the telephone number for H & R Block were asked whether they wanted the 900 Main Street address

10

or the new office at 802 Main Street.  In concluding that injunctive relief was proper, the court

rejected Robert's argument that he could not be enjoined from competing with H & R Block because

he did not sign the franchise agreement, noting the established rule in many jurisdictions that a

stranger to a non-compete agreement may be enjoined from aiding and abetting the convenanter from

breaching his agreement.  *See id.* at 760.  The court of appeals concluded that the trial court properly

enjoined Robert:

> Contrary to Robert's argument, the trial court's decision does not rest upon the
> existence or non-existence of a contractual relationship between Robert and Block.
> Robert knowingly participated and aided June in the violation of her contract with
> Block.  Their cooperative conduct amounted to mere subterfuge designed to avoid
> June's obligation under the contract.  The court did not err by including Robert
> within the scope of the injunction.

*Id.* at 762.

Another court reached a similar result in *ServiceMaster Residential/Commercial Services,*

*L.P. v. Proctor*, Bus. Franchise Guide (CCH) ¶ 12,251 (D. Neb. Oct. 31, 2001).  In that case,

Kenneth Proctor began working as the production manager for the Lincoln, Nebraska ServiceMaster

franchise in 1998.  The ServiceMaster franchise provided cleaning and restoration services to

residential and commercial customers.  Later that year, Proctor's parents, David and Linda Proctor,

began to consider purchasing the franchise.  Kenneth Proctor and his parents formed a corporation,

DLK&P, for the purpose of purchasing the franchise.  David and Linda were the shareholders, and

David, Linda, and Kenneth were the officers and directors of DLK&P.   DLK&P purchased the

franchise in November 1998 and operated it for about two years.  Kenneth Proctor served as the

general manager for the business after the purchase. In October 2000, ServiceMaster sent to DLK&P

a written notice of its intent to terminate the franchise due to defaults by DLK&P.  DLK&P failed

11

to cure the defaults, and the franchise terminated on January 15, 2001.  Prior to the termination, David Proctor filed a Chapter 7 bankruptcy petition.  Subsequently, the Proctors dissolved DLK&P and the corporate assets became part of the bankruptcy estate.  Kenneth Proctor purchased those assets from the bankruptcy estate in March 2001 and assigned them to his wife, Dawn Wiedenfeld, for no consideration.  Dawn Wiedenfeld then assigned the assets to a new corporation that she formed, PROClean, Inc., of which she was the sole director and officer, in exchange for 1000 shares of stock.  PROClean operated out of the same location from which DLK&P operated the ServiceMaster franchise and it continued to use, at least for some time, the telephone number of the DLK&P ServiceMaster franchise.  PROClean also sent solicitations to former DLK&P customers. In short, Kenneth Proctor continued to operate the business from the same location without interruption.  The court concluded that under the facts, Kenneth Proctor should be enjoined from operating a competing cleaning business pursuant to the non-compete provision in the franchise agreement.  In a subsequent memorandum and order addressing the parties' motions for clarification, the court concluded that the injunction should extend to Dawn Wiedenfeld and PROClean pursuant to Rule 65(d) to prohibit them from aiding or abetting Kenneth Proctor in violating the provisions of the non-compete provision in the franchise agreement.  *See ServiceMaster Residential/Commercial Servs., L.P. v. Proctor*, Bus. Franchise Guide (CCH) ¶ 12,252 (D. Neb. Jan. 3, 2002).

The court in *Merry Maids, L.P. v. WWJD Enterprises, Inc.*, No. 8:06CV36, 2006 WL 1720487 (D. Neb. June 20, 2006), a case cited by the Trust and Miracle, applied Rule 65(d) to enjoin a non-party from aiding and abetting a violation of a non-compete agreement.  In that case, James Lovely was a franchisee of a Merry Maids cleaning business.  His wife, Stephanie Lovely, was

12

involved in operating the franchise.  In November 2005, the franchisor notified James Lovely of the termination of his franchise.  In December 2005, after negotiations for renewal of the franchise agreement failed, the franchisor reminded James Lovely of the non-compete provision in the franchise agreement.  That same month, James Lovely gave Stephanie Lovely $10,000 from an account accessible only to him for the purpose of starting a new business, Maids & More, Inc.  James Lovely also transferred all of the assets of the Merry Maids franchise to Stephanie Lovely and Maids & More, Inc. without any requirement that either one of them reimburse him.  James Lovely also assisted Stephanie Lovely by training her in bookkeeping and payroll tasks using the Merry Maids software.  Stephanie Lovely contacted Merry Maids customers to tell them about the existence of Maids & More and to let them know that the business would no longer be a Merry Maids franchise.  In addition, Maids & More hired the former employees of the Merry Maids franchise.  The court concluded that an injunction should enter against James Lovely prohibiting him from violating the non-compete agreement and that Stephanie Lovely should be enjoined, as well, from violating the provisions of the non-compete.  It reasoned:

> The formation of Maids & More did not involve any arms-length transaction between James and Stephanie Lovely.  The evidence was uncontroverted that James Lovely gave Stephanie Lovely the sum of $10,000 from an account she could not access for the purpose of starting Maids & More.  There was no expectation that Stephanie or Maids & More would reimburse James for his $10,000 advance.  James Lovely and/or WWJD also transferred the physical assets of the Merry Maids franchise to Stephanie Lovely for no consideration.  The transfers of property and money between James and Stephanie Lovely were undocumented.   James Lovely also gave confidential and proprietary information to Stephanie Lovely, i.e., the Merry Maids customer list and proprietary software.  Using this information, Stephanie Lovely was able to contact and solicit business from Merry Maids customers.  The cleaning business operating out of 6679 Sorensen Parkway continued, uninterrupted, during its transition from a Merry Maids franchise to Maids & More, which now supplies services formerly supplied to its customers by Merry Maids.  Finally, the business property has remained within the Lovely family, presumably to the benefit of all

13

defendants.  The evidence, considered as a whole, and based on the credibility of the various witnesses, strongly suggests that James Lovely intended to and has "parked" his cleaning business with his wife, so he can return and run it himself after the one-year contractual period expires.

*Id.* at 12.

The Trust and Miracle contend that there is no basis to enjoin them from violating the non-competition provisions of the franchise agreements because, in contrast to the cases discussed above, there is no evidence that they are conspiring with Aron Alan to violate the non-competition agreements.  They contend that the Trust's decision to employ the assets in a tanning business is based merely upon a business decision – similar to that of any commercial lender – to maximize the value of the collateral.

While the Court agrees with the Trust and Miracle that the facts presented in this case are distinguishable from the facts in the cases cited above, the Court believes that there are material similarities that render injunctive relief appropriate.  Incidentally, the parties have devoted a substantial part of their briefing to the issue of whether the loan arrangement between the Trust and Aron Alan is consistent with standard commercial lending practices or whether it is more like a non-arms-length transaction designed to protect Aron Alan's business from the constraints of the non-compete provisions.  Although not especially important to the Court's analysis, the Court agrees with Tanfran that no reasonable commercial lender would have allowed a borrower such as Aron Alan to remain in default for more than two years without taking action to apply the collateral to the borrower's defaulted obligations.  The Court can take notice of this fact without expert testimony. In any event, regardless of whether the Trust's actions were on par with those of a commercial lender, the evidence presented shows that the Trust and Mirage did conspire with Aron Alan to avoid the effect of the non-competition agreement.

Contrary to what the Trust and Miracle represent, the situation here is not simply a case where a secured creditor has repossessed its assets and has decided to use them to operate a business. The timing of Aron Alan's surrender of the assets to the Trust, alone, suggests that it had the purpose not of furthering the Trust's collection of the outstanding debt, but rather of avoiding the effects of Tanfran's notice of termination and the non-compete agreements while preserving Aron Alan's ongoing tanning business. The Trust acted to "enforce" its security interest only after Tanfran sent its notice of termination to Aron Alan. Apart from the timing, the evidence shows that the Trust obtained more than its collateral covered by its security agreement and that Aron Alan played more than a passive role in ensuring that the business would continue uninterrupted. The Trust and Miracle acted with Aron Alan to violate the franchise agreements by using the former franchise telephone numbers to direct business to Miracle and by failing to assign those numbers to Tanfran or cease using them; by using the franchise customer lists[1]; and by using Tanfran's operations manuals and proprietary software. Moreover, by their joint conduct, Aron Alan and the Trust acted to foreclose Tanfran from exercising its right under the franchise agreements to purchase Aron Alan's business assets, even though Tanfran's counsel expressed Tanfran's interest in doing so.[2] (Letter from Murphy to Snide of November 27, 2006, at 2, Defs.' Mem. of Law Ex. J. ("Tanfran may be interested in making a bid for the assets.") Essentially, the business was passed from Aron Alan to the Trust and Miracle uninterrupted, with the only visible change being three letters in name of the business. (Bur Decl. & attachment (filed in support of Pl.'s Supplemental Br.) (describing

---

[1] Although the Trust and Miracle state that they did not use the customer lists, it is reasonable to infer that Miracle made some use of that information in order to verify information about tanning packages that were sold to Mirage customers, which Miracle continued to honor after the name change.

[2] Because the franchise agreements were in existence prior to the time that the Trust made the loan to Aron Alan, the Trust would have had at least constructive knowledge of Tanfran's rights and Aron Alan's obligations regarding the franchise assets under the franchise agreements when it made the loan.

employee representations that nothing except the name and the franchise status had changed).)  In short, to allow the Trust and Miracle to continue the tanning business would be tantamount to permitting Aron Alan to violate the non-competition agreements.  Thus, the Court will extend the injunction to the Trust and Miracle.

Apart from their argument that there is no basis for enjoining them from operating the tanning business, the Trust and Miracle do not contend that the terms of the non-competition agreements are unreasonable or otherwise unenforceable.  The Court finds no reason to conclude that the duration and geographical restrictions are unreasonable.  *See Bristol Window & Door, Inc. v. Hoogenstyn*, 250 Mich. App. 478, 497-98, 650 N.W.2d 670, 680 (2002).

**B.      Irreparable Harm**

The Court concludes that Tanfran will suffer irreparable harm if a preliminary injunction is not entered.  As the court observed in *Merry Maids*, *supra*, a franchisor's inability to enforce a covenant not to compete affects not only the franchisor's ability to maintain control of its reputation and goodwill, but also to re-franchise the area.  This harm cannot easily be measured by an award of damages.  *See* 2006 WL 1720487, at *11.  The Trust and Miracle do not argue otherwise.

**C.      Substantial Harm to Others**

There is no indication that granting the requested preliminary injunction will cause substantial harm to others.  Although the Trust and Miracle will be precluded from operating the tanning businesses within the restricted areas for the duration of the non-compete obligation, they may still use the assets to operate tanning businesses outside of those areas.  They will simply be prevented from doing what Aron Alan agreed not to do.

16

**D.      The Public Interest**

To the extent that this factor bears any weight in the Court's analysis, it weighs in favor of the interest in enforcing reasonable non-compete provisions among parties to contracts.

### IV.  <u>Conclusion</u>

For the foregoing reasons, the Court will extend the preliminary injunction against Aron Alan and the Estate to the Trust and Mirage pursuant to Rule 65(d).

An Order consistent with this Opinion will be entered.  Because Tanfran is entitled to the full benefit of the non-compete provision, the two-year period will commence the date that the Order is entered.


Dated:  June 20, 2007                                  _____/s/ Gordon J. Quist_____
                                                           GORDON J. QUIST
                                                           UNITED STATES DISTRICT JUDGE